UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

VINCENT EDWARD CROSSLEY,

                Petitioner,             Case No. 1:07–cv-518

v.                                     Honorable Gordon J. Quist

THOMAS K. BELL,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.

§ 2254.  Petitioner is serving a term of life imprisonment, imposed by the Berrien County Circuit

Court on November 3, 1999, after a jury convicted Petitioner of second-degree murder, MICH.

COMP. LAWS § 750.317.  In his *pro se* petition, Petitioner raises four grounds for relief, as follows:

    I.      THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE VERDICT OF
           2nd DEGREE MURDER AND [PETITIONER'S] CONVICTION
           REPRESENTS A DENIAL OF DUE PROCESS OF LAW.

    II.     THE COURT['S] FAILURE TO CORRECTLY INSTRUCT THE JURY ON
           THE ISSUE OF INTENT AND KNOWLEDGE IN RESPONSE TO ITS
           QUESTION ALLOWED [PETITIONER'S] CONVICTION OF 2nd
           DEGREE MURDER.

    III.    [PETITIONER] WAS DENIED A FAIR TRIAL BY THE ERRONEOUS
           ADMISSION OF EVIDENCE OF "SIMILAR ACTS" WHICH WERE NOT
           RELEVANT AND WHICH WERE MORE UNFAIRLY PREJUDICIAL
           THAN PROBATIVE.

    IV.    THE PROSECUTOR COMMITTED REVERSIBLE ERROR AND
           DENIED [PETITIONER] A FAIR TRIAL BY REPEAT[EDLY]
           APPEALING TO THE SYMPATHY OF THE JURY.

(Pet. at 6-7,9-10, docket #1.) Respondent has filed an answer to the petition (docket #10) stating that the grounds should be denied because they are meritless, procedurally defaulted and/or noncognizable state law claims that have no merit. Upon review and applying the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA) standards, I find that Petitioner's first, second and third grounds are without merit. I also find that Petitioner's fourth ground, which is divided into two sub-claims, has one sub-claim that is procedurally defaulted and another sub-claim that is without merit. Accordingly, I recommend that the petition be denied.

## Procedural History

### A.    Trial Court Proceedings

The state prosecution arose from Petitioner's alleged involvement in the death of two-year old Abryanna Grant from head injuries in April 1999. Petitioner was charged with one count of second-degree murder, and following a preliminary examination on June 3, 1999, he was bound over on the charge of second-degree murder. (June 3, 1999 Prelim. Examination Hr'g at 99, docket #13.) Petitioner was tried before a jury beginning October 28, 1999, and concluding on November 3, 1999.[1]

Gregory Abrams, a police officer with the Benton Harbor Police Department, testified that he was dispatched to 648 Pearl Street on April 5, 1999 around 8:30 p.m. because a child was not breathing. (Tr. I, 166-67.) When Sergeant Abrams arrived at the residence, a young lady directed him to the upstairs apartment. In the apartment, he found Petitioner, Tammarah Leonard

---

[1]Transcripts from the trial will be numbered I through IV as follows:

Transcript of October 28, 1999, docket #14 (Tr. I);
Transcript of October 29, 1999, docket #15 (Tr. II);
Transcript of November 2, 1999, docket #16 (Tr. III); and
Transcript of November 3, 1999, docket #17 (Tr. IV).

and the child. The child was lying on the bed in a semi-conscious state. (Tr. I, 170.) Petitioner was rubbing the child's back and Tammarah, the child's mother, was gathering some items for the hospital. (Tr. I, 171.) Sergeant Abrams noticed that the child's face was very red. He also saw some old bruising and scars on the left side of the child's face. He could not see the right side of the child's face because the child was lying on her right side. At that point, Sergeant Abrams ran downstairs to get his medical bag but he was met by a paramedic. Sergeant Abrams noted that Petitioner seemed to be scared and concerned about the child. (Tr. I, 172.) Sergeant Abrams also identified several photographs of the home, which were admitted into evidence. (Tr. I, 167-68.)

Kathleen Kuplic testified that she was a paramedic for Medic One Ambulance. (Tr. I, 174-75.) Kuplic responded to the call of a child having a seizure at 648 Pearl Street. Kuplic went upstairs and found the patient on the bed. (Tr. I, 176.) The child's breathing was very slow and labored. (Tr. I, 177.) Kuplic told Petitioner to take the child down to the unit but was surprised when he did not follow her quickly downstairs. (Tr. I, 177-78.) Kuplic intubated the child because her breathing was shallow. Kuplic also found very little response in her pupils, which is indicative of a head injury or an overdose. (Tr. I, 178.) Kuplic and her partner transported the child to the hospital but did not stay because they had another call. (Tr. I, 179-80.) After returning to the hospital with another patient, Kuplic checked on the little girl. Kuplic saw some red marks on the child's temple and forehead. (Tr. I, 180.) Kuplic recalled that Petitioner told her at the hospital that he shook the child to try to wake her. (Tr. I, 181.)

Ollie Leonard testified that Abryanna Grant was her granddaughter. At the time of her death in April 1999, Abryanna was two years old. (Tr. I, 185.) Tammarah Leonard, Abryanna's mother, was Ollie's daughter. (Tr. I, 185-86.) Tammarah and Abryanna lived with Ollie from

- 3 -

Abryanna's birth on March 8, 1997 until January 1999, with the exception of a couple of months when Tammarah and Abryanna lived with Tammarah's friend. (Tr. I, 187-88.) In January 1999, Tammarah and Abryanna moved to 648 Pearl Street with Petitioner. (Tr. I, 188.) Prior to the move, Ollie did not observe any bruises on Abryanna's body. (Tr. I, 188.) After the move, she noticed a bruise on Abryanna's ear, scratches in the back of her ear, a bruise on her forehead and a scratch on her neck. (Tr. I, 189-90.) Ollie talked to Tammarah and Petitioner separately about the bruises but neither of them could explain the bruises on Abryanna. (Tr. I, 189-91.)

In late February or March, Ollie talked to her ex-husband about her concerns. (Tr. I, 191.) On March 7, 1999, Ollie's ex-husband called Protective Services. (Tr. I, 190.) Michelle Kuiken from Protective Services visited Ollie and Abryanna at Ollie's house in March 1999. (Tr. I, 191.) Because Abryanna had been living with Ollie at that time, her bruises had healed. When Tammarah had been living with Ollie, Ollie had seen Tammarah spank Abryanna once with a comb too hard. (Tr. I, 192.)

Ollie learned of Abryanna's first seizure on March 17, 1999. (Tr. I, 192.) Abryanna stayed in the hospital approximately three days during that visit. After that incident, Ollie tried to have Abryanna stay at her house more often. (Tr. I, 193.) Abryanna was again taken to the hospital on April 5, 1999. (Tr. I, 195-96.) Ollie was supposed to watch Abryanna that night because Tammarah was going to start a new job the next day. (Tr. I, 196.) After dinner, Ollie went to Tammarah's house with another daughter, Kelly Leonard, and a friend to pick Abryanna up. (Tr. I, 196-97.) When they arrived at Tammarah's house, they found Abryanna in an ambulance. (Tr. I, 197.)

Ollie last saw Abryanna alive three days before she died. Abryanna was not herself. Abryanna would hardly eat and complained of her head hurting. (Tr. I, 199.) Prior to January or March, 1999, Abryanna would run around the house and play. (Tr. I, 200.) Ollie identified pictures of Abryanna at the hospital on April 6, which were admitted into evidence. (Tr. I, 200-01.) Ollie also identified several bruises on Abryanna's head, stomach, neck and leg, some of which she recognized and some of which she did not recognize. (Tr. I, 202-04.)

On cross-examination, Ollie testified that prior to March 17, Abryanna was nervous, chewing her lip and always shaking. (Tr. I, 207.) On April 5, Tammarah mentioned that Abryanna had collapsed at the bottom of the steps. (Tr. I, 209.) Tammarah explained that the bruising to Abryanna's head occurred because of that fall. (Tr. I, 209-10.) Ollie testified that Tammarah never told her that Petitioner caused any injury to Abryanna. (Tr. I, 210.)

Kelly Leonard testified that Tammarah Leonard is her older sister. (Tr. I, 213.) Kelly lived at her mother's house with Tammarah and Abryanna before they moved in January 1999. (Tr. I, 213-14.) Kelly observed Tammarah spank Abryanna. (Tr. I, 214.) After Abryanna and Tammarah moved to Pearl Street with Petitioner, Kelly noticed a large bruise on Abryanna's forehead and marks behind her ear and across her chest. (Tr. I, 214-15.) When Kelly asked Tammarah about the bruises, Tammarah explained that the bruises occurred at the babysitter's house or on the bathtub. (Tr. I, 215.) On April 5, Kelly went with her mother to pick Abryanna up. Abryanna, however, was in an ambulance. (Tr. I, 216.) A couple of days prior to that, Kelly had noticed that Abryanna had been a little sleepy. (Tr. I, 217.)

On cross-examination, Kelly remembered an incident in 1998 where Tammarah spanked Abryanna too hard. (Tr. I, 217-18.) Kelly also testified that Tammarah explained that a

welt across Abryanna's chest was from snatching Abryanna away from a wall outlet. (Tr. I, 218.) In March, Kelly found Abryanna complaining of headaches and tired. (Tr. I, 219.)

Erica Robinson testified that she lived across from Tammarah's apartment on Pearl Street in April 1999. (Tr. I, 222.) A couple weeks before Abryanna died, Erica saw Petitioner kick Abryanna in the buttocks and push her in the back of the head on the outside steps of the apartment. (Tr. I, 224-25.) Abryanna did not fall down because her mother was holding her hand. (Tr. I, 225.) They then went into the house. (Tr. I, 225.)

Doctor Julie Wohrley testified as an expert in pediatrics and critical care. (Tr. II, 250.) Doctor Wohrley cared for Abryanna Grant on April 5 at Bronson Hospital in Kalamazoo. (Tr. II, 247.) When Abryanna arrived at the hospital she was on full life support and unconscious. (Tr. II, 250.) The hospital performed a Computerized Axial Tomography (CAT) scan of Abryanna's brain. The CAT scan showed old and new areas of bleeding in Abryanna's brain. (Tr. II, 251.) On April 6, Doctor Wohrley and Trooper Kathy Morton inspected Abryanna's body for any abuse. (Tr. II, 252-53.) Doctor Wohrley testified that she made a chart of all of Abryanna's bruises, old and new, on her head, chest, left arm, right hip and left leg. (Tr. II, 257-63.) Specifically, Doctor Wohrley identified thirty-five bruises on Abryanna's body and ten on her head. (Tr. II, 270-71.) With the exception of one, Doctor Wohrley thought that all of the bruises on Abryanna's head were new. (Tr. II, 290.) Doctor Wohrley inspected Abryanna's body twice. (Tr. II, 270.) Over the course of time, more bruises became prominent, which is indicative of recent injuries. (Tr. II, 270.) Doctor Wohrley also identified several photographs of Abryanna from Bronson Hospital on April 6, which were admitted into evidence. (Tr. II, 264.)

In the course of her examination, Doctor Wohrley found hemorrhages (broken blood vessels), retinal bleeds and swelling of the optic nerves in both of Abryanna's eyes. (Tr. II, 271-73.) Doctor Wohrley concluded that a severe trauma to the head and neck would cause this type of injury, such as shaking. (Tr. II, 273.) Doctor Wohrley also found that two bones in Abryanna's arm had been broken above the wrist and were several weeks to months old. (Tr. II, 274-75.) Even though Abryanna's skull had fused together after she was born, her skull had separated again from inter-cranial pressure. (Tr. II, 275-77.) This can be caused by shaking or by an impact to the head. (Tr. II, 276-77.) In Doctor Wohrley's opinion, Abryanna would not survive her injuries. (Tr. II, 277.) On April 7, Abryanna died. (Tr. II, 278.)

When Doctor Wohrley spoke to Tammarah in the hospital, she learned that Abryanna had thrown a temper tantrum around 3:00 p.m. (Tr. II, 278-79.) Abryanna had fallen to the linoleum floor and hit the right side of her head. (Tr. II, 279.) Tammarah also hit Abryanna's leg with the belt loop of a child's belt earlier that day. A couple days earlier, Abryanna had hit her head on the refrigerator door. (Tr. II, 280.) Doctor Wohrley, however, did not think Tammarah sufficiently explained the severity of Abryanna's injuries. (Tr. II, 279, 281.) Doctor Wohrley testified that the force required to inflict Abryanna's injuries would have been similar to a child falling from a two-story building onto the ground. (Tr. II, 281.) Abryanna's injuries were consistent with the combination of Shaken Baby Syndrome and a person applying objects with significant force to her head or throwing her against something. (Tr. II, 273, 291-92.)

Nurse Carol Martin testified that she was in charge of the pediatric unit at Bronson Hospital on April 5 and 6, 1999. Nurse Martin found that Abryanna Grant had bruising all over her head and body, and her eyes were fixed and dilated. (Tr. II, 294.) She noted that Petitioner dropped

Tammarah Leonard off at the hospital but did not stay. (Tr. II, 294-95.) On cross-examination, Nurse Martin testified that Tammarah told her that she had spanked Abryanna with a belt earlier in the day. (Tr. II, 296.)

Doctor Robert Beck testified as an expert in the area of pediatric and critical care. (Tr. II, 300.) Doctor Beck examined Abryanna Grant on April 6, 1999. He found her to be in critical and unstable condition. (Tr. II, 301.) Abryanna was on mechanical ventilation and unresponsive. (Tr. II, 301.) Doctor Beck noted a fair amount of bruising and scrapes on her face, head and arms. (Tr. II, 303.) When Doctor Beck examined Abryanna, he found retinal hemorrhages in her eyes, which is common in Shaken Baby Syndrome. (Tr. II, 304.) Based on Abryanna's injuries, Doctor Beck concluded that she had been shaken violently back and forth. However, the bruising around the face, head and arms of the child also indicated that the child was battered. Doctor Beck testified that being shaken violently and impacting a door, wall or tabletop could cause those marks. A hand or fist could also make those marks. (Tr. II, 305.) Because of those injuries, one would expect seizures or loss of consciousness within five minutes or instantaneously. (Tr. II, 309.) Doctor Beck also reviewed a CAT scan of Abryanna's brain and found old and new brain injuries. (Tr. II, 308.)

Doctor Beck testified that he reviewed the CAT scan of Abryanna's head from when she was hospitalized on March 17, 1999. (Tr. II, 310.) Doctor Beck noted that there was some fluid collection in the brain that was close to abnormal but nothing that would have prompted a further work-up. (Tr. II, 314.) Doctor Beck thought the seizures on March 17 were probably secondary to a previous brain injury caused from shaking. (Tr. II, 314-15.) Doctor Beck concluded that Abryanna died from "Shaken Infant Syndrome." (Tr. II, 316.)

On re-direct examination, Doctor Beck thought that the old injury was something Abryanna could survive. However, Doctor Beck thought that she would have behaved differently due to the injury. Abryanna would have been sleepy, lethargic, irritable and would have experienced a loss of appetite, vomiting and headaches. (Tr. II, 323.)

Tomika Johnson testified that she lived in the downstairs apartment at 648 Pearl Street. (Tr. II, 326-28.) Tomika moved into the apartment in February 1999. (Tr. II, 328.) Tomika is a cousin to Petitioner. (Tr. II, 328.) On April 5, Tomika heard Petitioner yelling for Abryanna Grant to go to the bathroom around 2:00 or 3:00 p.m. (Tr. II, 329.) Around 8:00 or 8:30 p.m., Tammarah Leonard banged on Tomika's door to call 911 because Abryanna was having a seizure. (Tr. II, 330.) Tomika called 911 and saw Petitioner carrying Abryanna up the stairs. Tammarah then came back to Tomika's apartment and told her that Abryanna was not breathing. The police and ambulance eventually took Abryanna to the hospital. (Tr. II, 332.) Tomika testified that she never saw Tammarah abuse Abryanna. (Tr. II, 333.) In March, Tomika noticed that Abryanna cried for her mother to hold her a lot. (Tr. II, 334.)

On cross-examination, Tomika stated that she heard Petitioner yelling upstairs on April 5, but she did not hear someone hitting a wall or the floor. Tomika also did not hear Abryanna cry or scream. Tomika had never witnessed Petitioner abusing Abryanna. (Tr. II, 336.)

Doctor David Puzycki testified as an internist and pediatrician expert. Doctor Puzycki examined Abryanna Grant on April 5, 1999 at Lakeland Hospital. (Tr. II, 339-40.) Doctor Puzycki noted that Abryanna was on life support and unconscious. (Tr. II, 340, 342.) He found that her pupils were dilated and fixed, which is indicative of a serious brain injury. (Tr. II, 340.) Abryanna also did not respond to any painful stimuli. (Tr. II, 339-40.) Doctor Puzycki noticed

some red marks on her head. (Tr. II, 341.) Because Lakeland Hospital did not have the facilities to care for intubated children, Abryanna was transferred to Bronson Hospital. (Tr. II, 344.)

Michelle Kuiken testified that she is a Children's Protective Services Worker. (Tr. II, 346.) Michelle was assigned to Abryanna Grant's case because of allegations of child abuse on March 7, 1999. (Tr. II, 346-47.) The next day, Michelle visited Ollie Leonard and Abryanna at Ollie's home. (Tr. II, 347.) During that visit, Abryanna sat in her grandmother's lap for most of the time. Michelle and Ollie checked Abryanna's body for bruises. Michelle did not find any bruises. (Tr. II, 348.) Ollie, however, was still concerned. Michelle testified that Ollie was going to stay in touch with her if she noticed any more bruises on Abryanna. Ollie mentioned that the bruises began to appear between January and March when Tammarah Leonard had moved out of Ollie's home. Ollie was also concerned about Tammarah's relationship with Petitioner. (Tr. II, 349.)

On March 8, 1999, Michelle met with Tammarah briefly. (Tr. II, 350.) Tammarah mentioned that she never left Abryanna alone with anyone, including Petitioner. Tammarah also stated that she was the only one to discipline Abryanna. Tammarah would "pop" Abryanna on the behind with her hand. (Tr. II, 351.) On March 12, Michelle visited Tammarah's apartment again. At that time, Tammarah was not home. (Tr. II, 351.) Michelle, however, spoke to Petitioner about the bruises on Abryanna. Petitioner stated that he was never alone with Abryanna because he never wanted to be accused of abusing a child. Petitioner also stated that he did not discipline Abryanna because her mother, Tammarah, disciplined her. (Tr. II, 352.)

On March 17, Michelle stopped by Tammarah's apartment for another home visit but was informed by Petitioner that Abryanna had been rushed to the emergency room because she had a seizure. (Tr. II, 352.) Michelle went to the hospital immediately and found Tammarah and

Abryanna talking and giggling in the hospital room. (Tr. II, 353.) Michelle noted that Abryanna appeared very bonded with her mother and grandmother. During Michelle's visit, Tammarah went over the events of the morning. Earlier that morning, Abryanna awoke and needed to use the toilet. Tammarah helped her to the toilet but Abryanna began to shake and her eyes rolled in the back of her head. They called the ambulance. (Tr. II, 354.) The physicians thought that Abryanna's seizure was caused by a high fever. (Tr. II, 355.) On March 19, Abryanna was discharged from the hospital. (Tr. II, 356.) Michelle testified that she recommended counseling for Tammarah and to move back in with her mother. (Tr. II, 357.) Tammarah refused to move back in with her mother because she would have felt like a failure. After those referrals were made, Michelle closed her case. Even after the case was closed, Michelle visited Tammarah and Abryanna on March 30. (Tr. II, 358.) She found them watching TV and having some snacks. (Tr. II, 358-59.) Michelle later learned of Abryanna's death. (Tr. II, 359.)

On cross-examination, Michelle testified that she closed her case file around March 26. (Tr. II, 361.) Michelle found that Tammarah had not failed to protect her child nor had Petitioner hurt Abryanna. (Tr. II, 361-62.) Michelle also thought that Abryanna had bonded with Tammarah and Petitioner. (Tr. II, 362.)

On re-direct examination, Michelle testified that she wrote Petitioner and Abryanna had bonded because Abryanna had asked for Petitioner a couple of times when she was in the hospital. (Tr. II, 367.)

Anthony Turner testified that he is a Michigan State Trooper. (Tr. II, 370.) Trooper Turner testified that he videotaped the inside of the residence of Tammarah Leonard and Petitioner. (Tr. II, 372-73.) The videotape was admitted into evidence. (Tr. II, 374.)

Tammarah Leonard, Abryanna Grant's mother, testified next for the prosecution. (Tr. II, 374.) Tammarah testified in accordance with her plea agreement. (Tr. II, 375.) Tammarah was charged with involuntary manslaughter. (Tr. II, 375-76.) In return for her plea and testimony against Petitioner, Tammarah's sentence would not exceed a year in county jail followed by five years' probation. (Tr. II, 376.)

Tammarah testified that Abryanna was born on March 8, 1997. (Tr. II, 378.) Tammarah lived with her mother from the time that Abryanna was born until she moved in with Petitioner, except for a couple of months when she lived with a friend. (Tr. I, 379-81.) Tammarah met Petitioner in November 1998 when they both worked at K-Mart. (Tr. II, 377-79.) Tammarah, Abryanna and Petitioner moved to 648 Pearl Street in January 1999. (Tr. I, 381.) In January and February, Petitioner hit, choked, kicked and bit Tammarah. (Tr. I, 386.)

In March, Erica Thompson and her young son came to watch a movie with Tammarah and Abryanna. (Tr. I, 386-87.) Tammarah eventually put Abryanna to bed but she kept on getting out of bed. When Petitioner noticed that Abryanna was out of bed, he yelled "[a]ren't you supposed to be in bed?" and then he picked her up from Erica's lap. (Tr. II, 388.) Petitioner held Abryanna by her arms and shook her. He also held Abryanna by one arm and one leg and shook her again. Abryanna cried during the incident. Tammarah then took Abryanna away from Petitioner and calmed her down. (Tr. II, 389.) A couple days later, Tammarah received a call from Michelle Kuiken from Protective Services. However, Tammarah did not tell Michelle about the shaking incident because she was scared that they would take away Abryanna and Petitioner. Tammarah also did not tell her mother about the shaking incident. (Tr. II, 391.) After that incident, Tammarah

noticed that Abryanna had headaches, a loss of appetite, and wanted to sleep all the time. Previously, Abryanna had been an energetic child. (Tr. II, 392.)

Tammarah testified that Abryanna was rushed to the hospital on March 17, 1999. That night, Abryanna had a fever. (Tr. II, 393.) Tammarah put Abryanna on the potty in Tammarah's bedroom but Abryanna started screaming. Abryanna was shaking and her eyes rolled in the back of her head. Tammarah ran to Tomika Johnson's apartment and called an ambulance. When she returned, Petitioner had started giving Abryanna mouth-to-mouth resuscitation. Tammarah did not tell the doctor or Michelle about the shaking incident because she was scared of Petitioner. (Tr. II, 394.) Abryanna's doctor thought the seizure occurred from the fever. (Tr. II, 395.) When the doctor found marks on Abryanna's stomach, Tammarah thought they were due to pull-up diapers, which were too small for Abryanna, or from scooting across the carpet. (Tr. II, 398.) After the hospital visit, Abryanna stayed with her grandmother a lot. (Tr. II, 396.)

Tammarah also testified as to the events of April 5. While Petitioner was getting ready to leave on April 5, Tammarah fixed Abryanna's breakfast. Tammarah and Petitioner had an argument and Petitioner threatened to move out. Tammarah grabbed Abryanna and went downstairs to talk with Petitioner. (Tr. II, 399.) Petitioner's mother also stopped by for a few minutes. (Tr. II, 400.) After Petitioner left, Tammarah dressed Abryanna. They played, watched TV and took a nap. For lunch, Tammarah fixed Abryanna some ravioli. After lunch, Petitioner came back and mentioned that he was going to walk to the store. Because Abryanna wanted to go outside, Petitioner asked if he could take Abryanna to the store. When they came back, Abryanna showed Tammarah a little bag of candy. (Tr. II, 401.) Petitioner left again. (Tr. II, 402.)

When Petitioner returned in the evening, Abryanna was on her potty eating ravioli. (Tr. II, 402-04.) Tammarah was gathering Abryanna's coat, diaper bag and clothes so that Abryanna could sleep over at her grandmother's house. Petitioner smelled like he had been drinking beer and smoking marijuana. (Tr. II, 404.) Tammarah heard Abryanna coughing while she was packing. (Tr. II, 404-05.) Tammarah ran out and saw Petitioner put his hand in Abryanna's mouth to take out the ravioli. Tammarah witnessed Petitioner hold Abryanna by her arms, ask her why she was playing with her food, and shake her. (Tr. II, 405.) "He had started shaking her like that, real hard. And I dropped her diaper bag and before I got over he had hit her across her head a couple times and then I [] grabbed her from him." (Tr. II, 405.) Tammarah testified that Petitioner hit Abryanna three or four times, "real hard." (Tr. II, 405.) Abryanna was crying. (Tr. II, 405-06.) When Tammarah took Abryanna from Petitioner, she stopped crying. Tammarah got Abryanna's coat and said she was going to take her to her mother's house. Tammarah then asked Abryanna whether she wanted to walk or be carried. Abryanna wanted to walk. Tammarah noticed that she was dragging a little. (Tr. II, 406.) They started to walk down the stairs. When they were almost down the stairs, Abryanna went limp. (Tr. II, 407.) Before Tammarah could catch her, she bumped her head lightly on the chair railing. Tammarah described Abryanna as shaking, her eyes rolling in the back of her head, and breathing very slowly. Tammarah ran Abryanna back upstairs. Petitioner had already opened the door. They laid Abryanna on the bed. Tammarah then ran downstairs and asked Tomika to call for an ambulance. When Tammarah ran back upstairs, Abryanna was breathing very slowly and her eyes were still rolled in the back of her head. (Tr. II, 408.) Petitioner drove Tammarah to Lakeland Hospital and then to Bronson Hospital. During the trip, Tammarah cried. She did not talk to Petitioner about the incident because she was scared. (Tr. II, 409.)

- 14 -

Tammarah testified that Petitioner slapped her and ruptured her ear drum, which required a hospital visit on March 28, 1999. (Tr. II, 410.) Tammarah did not tell her doctor that Petitioner had slapped her because she was scared. (Tr. II, 412.)

After Abryanna died, Tammarah moved back into her mother's house but she continued to date Petitioner. (Tr. II, 412-13.) Tammarah told the police that Abryanna's injuries were due to: falling off the couch from a temper tantrum, running into the refrigerator or from a spanking. Tammarah testified that she told those things to the police to cover up for Petitioner. (Tr. II, 417-18.) Tammarah also stated that she lied to the doctors and Child Protective Services when she said that (1) she never left Abryanna alone with Petitioner, (2) Petitioner never abused Abryanna, and (3) Petitioner never disciplined Abryanna. (Tr. II, 398, 418.) Tammarah admitted to spanking Abryanna with a belt on April 5. Tammarah, however, denied shaking Abryanna or causing any of the marks on her head. (Tr. II, 419.)

On cross-examination, Tammarah testified that Petitioner would discipline Abryanna by having her stand in a corner, take a time out or nap, or stay in her room. (Tr. II, 429.) Tammarah did not believe that Petitioner meant to kill Abryanna. (Tr. II, 463-64.) Tammarah just thought it was his way of disciplining Abryanna. (Tr. II, 464.)

On re-direct examination, Tammarah testified that Petitioner first shook Abryanna on April 5 to see if there was something lodged in her throat. After that, Tammarah stated that Petitioner got violent. (Tr. I, 467.)

Doctor Stephen Cohle testified as an expert in forensic pathology. (Tr. III, 482.) On April 7, 1999, Doctor Cohle performed an autopsy of Abryanna Grant's body. (Tr. III, 487.) Doctor Cohle determined that two head injuries caused Abryanna's death: whiplash shaking syndrome and

blunt injuries to the head. (Tr. III, 488-89, 504.) The primary findings for the whiplash shaking syndrome were a subdural hemorrhage on the outer surface of the brain between the skull and brain and hemorrhages in the back of the eye. Those injuries are usually caused by the violent shaking of a small child so that the head whips back and forth on the neck and the brain, in turn, oscillates back and forth in the skull. (Tr. III, 489-90.) Because the brain is moving faster than the skull, the veins that connect the surface of the brain to the vascular space attached to the skull are torn as well as the blood vessels attached to the eyes. (Tr. III, 490.) It is comparable to a medium to high-speed automobile accident where a non-restrained child is ejected from the car and the child's head hits the ground at a high rate of speed or collides with something in the car. (Tr. III, 494-95.) Doctor Cohle also stated that it would take a fall of three stories or more to have a fatal head injury. (Tr. III, 496-97.) Doctor Cohle opined that an adult would have to use all of his or her strength to cause those injuries to a child. (Tr. III, 497.)

As for the blunt injuries to the head, Doctor Cohle determined that there were ten separate bruises beneath the scalp, which occurred within hours of Abryanna going to the hospital. (Tr. III, 498, 510.) While those injuries were not life-threatening, the force from which they had been applied could be life-threatening. Doctor Cohle also found tearing to the corpus callosum, the structure between the two cerebral hemispheres in the brain. (Tr. III, 498.) One or more of the blows to the head most likely caused the separation. (Tr. III, 499.) Once the cerebral hemispheres are torn, they do not reconnect. (Tr. III, 500.)

While Doctor Cohle determined that a head injury caused the death of Abryanna, he could not totally separate out the contribution of the shaking and the blows to the head. (Tr. III, 504.) It is possible to kill a baby by shaking him or her and it is also possible to kill a child by

striking the head hard enough. (Tr. III, 504-05.) Therefore, Doctor Cohle opined that the cause of death was generically a head injury and exactly how it was received was either or both of those scenarios. Doctor Cohle determined that Abryanna would have been incapacitated almost immediately after the head injury. (Tr. III, 505.) Doctor Cohle did not believe that a child would be able to walk after this injury. (Tr. III, 506-07.) Doctor Cohle also found multiple scars and abrasions on the head, trunk and extremities of Abryanna that he would not expect to see in a normal toddler. (Tr. III, 507.)

Doctor Cohle testified that he saw evidence of a hemorrhage two to four weeks old, which was most likely caused by a blow to the head. (Tr. III, 511.) Because of this injury, Doctor Cohle opined that Abryanna would have been crying due to the pain, would have been complaining of headaches, would have been sleepy, and may have had a loss of appetite. (Tr. III, 512.) Doctor Cohle found that Abryanna's seizure on March 17, 1999 could have been caused by this injury. (Tr. III, 513.) However, Doctor Cohle did not think that this injury would have had any role in her death because it was nearly healed. (Tr. III, 514-15.) Finally, Doctor Cohle determined the cause of death was homicide. (Tr. III, 516.)

Doctor Carol Luzzi testified as an expert in pediatrics. (Tr. III, 536.) Doctor Luzzi treated Abryanna Grant on March 17 at Lakeland Hospital because of a seizure. (Tr. III, 535.) Doctor Luzzi found that there was no indication of a fever in the Emergency Room. (Tr. III, 537.) A CAT scan was performed on Abryanna but it came back normal. (Tr. III, 538.) Doctor Luzzi testified that the mother never indicated that the child had been shaken approximately two weeks prior to the hospital visit. The mother never mentioned that the child had been complaining of headaches, had been lethargic or had lost her appetite. At the time of discharge, Doctor Luzzi never

determined what caused the seizure. (Tr. III, 540.) During her hospital stay, Doctor Luzzi noticed scars on Abryanna's stomach, her head and her leg. (Tr. III, 541-42.) The scars caused Doctor Luzzi some concern but she knew that Child Protective Services was working on the case. (Tr. III, 542.) After being discharged, Abryanna came in for a follow-up visit on March 23. (Tr. III, 541.) At that time, Doctor Luzzi noticed some old scars on Abryanna's back. (Tr. III, 543.) On March 23, Doctor Luzzi noted that the child was grouchy, sleeping a lot, eating sporadically and complaining of leg pain. (Tr. III, 544.) On March 29, they performed a x-ray of Abryanna's leg but it came back normal. (Tr. III, 545.) On March 30, Abryanna had her two-year old check up. (Tr. III, 545.) Marks on her back and neck were noted. (Tr. III, 546.) Having subsequently learned of the shaking incident in early March, Doctor Luzzi determined that the seizure could have been due to the shaking. (Tr. III, 547.)

Erica Thompson testified that she has known Tammarah Leonard since elementary school. After Tammarah moved in with Petitioner, Erica went to the apartment a couple of times. Erica noticed a couple of bruises on Abryanna Grant. In particular, she asked Tammarah about a bruise on Abryanna's forehead. (Tr. III, 551.) Tammarah indicated that Abryanna fell while running and bumped her head. (Tr. III, 552.) On March 4, Erica rented a couple movies to bring to Tammarah's apartment. (Tr. III, 554.) She also brought her four year-old son. (Tr. III, 555.) Erica testified that she noticed bruises on Abryanna's ear and leg on March 4. (Tr. III, 562.) Petitioner was in and out of the apartment that night. Eventually, Abryanna started whining and Petitioner told her to go to bed. Abryanna went to bed. (Tr. III, 555.) Abryanna then came out of her bedroom and sat on Erica's lap. (Tr. III, 555-56.) When Petitioner came upstairs, he grabbed Abryanna's arms and shook her. (Tr. III, 556.) He also flipped her upside down, held both of her legs together with

- 18 -

one hand and shook her again. (Tr. III, 556-57.) Petitioner said "[d]idn't I tell you not to get out of the bed?" (Tr. III, 556-57.) Petitioner put Abryanna down and she wobbled off to her room. (Tr. III, 558-59.) After Petitioner left, Erica asked Tammarah why she let Petitioner do that. Tammarah mentioned that when someone is disciplining Abryanna, the other does not say anything because Abryanna could get confused. (Tr. III, 557.) Tammarah said that she loved Petitioner. (Tr. III, 558.)

Kathy Morton testified that she is a Michigan State Police Trooper. (Tr. III, 568.) On April 6, Trooper Morton went to Bronson Hospital around 2:30 a.m. to investigate a possible victim of child abuse. (Tr. III, 569.) Trooper Morton and Doctor Julie Wohrley reviewed the child's body. (Tr. III, 570.) Trooper Morton noticed two particularly pronounced bruises on Abryanna Grant's head: in the back and on the right side. (Tr. III, 571.)

On cross-examination, Trooper Morton testified that Tammarah first stated that she was responsible for the injuries to Abryanna. (Tr. III, 578.) Trooper Morton told Tammarah during her first couple of interviews that what she was saying did not match Abryanna's injuries. (Tr. III, 579-80.) On re-direct examination, Trooper Morton testified that Tammarah eventually said that Petitioner had shaken Abryanna. (Tr. III, 582-83.)

Gary Shaffer testified that he is a detective with the Michigan State Police. (Tr. IV, 590.) In the early morning hours of April 6, Detective Shaffer received a phone call from the Benton Harbor Police Department about the apparent abuse of a child at Bronson Hospital. (Tr. IV, 591.) Detective Shaffer spoke with Petitioner on April 6 at the police department but he was not in custody at that time. Petitioner told Detective Shaffer that he was sitting on the couch in Tammarah Leonard's apartment when he heard a thump on the stairs. Petitioner saw Abryanna Grant at the

bottom of the stairs with Tammarah.  (Tr. IV, 592.)  Petitioner carried Abryanna up the stairs to the bedroom. (Tr. IV, 592-93.)

On April 13, 1999, Detective Shaffer interviewed Petitioner again with another detective.  Petitioner was not in custody.  (Tr. IV, 593.)  Petitioner testified that he drank that morning with some friends, returned to Tammarah's apartment around lunch, then went back out to drink and smoke marijuana.  (Tr. IV, 594.)  When Petitioner returned to Tammarah's apartment, Tammarah was getting Abryanna Grant ready to go to Tammarah's mother's house.  (Tr. IV, 594-95.)  After they left, he heard a thump on the stairway and saw Abryanna at the bottom of the stairs. (Tr. IV, 595.)  Petitioner denied ever shaking Abryanna.  (Tr. IV, 595.)  As for the March 17 incident, Petitioner stated that he played with Abryanna by bouncing her on his knee and she may have fallen off and struck her head on a metal footlocker, which was used as the coffee table.  (Tr. IV, 596.)  During the course of the investigation, Tammarah was also questioned several times because the child's injuries did not fit her explanation.  (Tr. IV, 597, 599.)  On May 12, Tammarah was arrested for involuntary manslaughter.  On May 21, Petitioner was arrested for second-degree murder.  (Tr. IV, 599.)  After he was arrested, Petitioner was read his *Miranda* rights and agreed to be interviewed.  (Tr. IV, 600.)  The interview was admitted into evidence.  (Tr. IV, 601-04.)

In the interview, Petitioner discussed the first incident with Erica Thompson in March.  When Petitioner left the apartment that night, Abryanna was going to bed.  Petitioner returned at 11:30 p.m. but Abryanna was still up.  Petitioner then "picked [Abryanna] up and [] put her on the top of the couch like the back part. I brought her legs [sic], I swung her, and I was swinging her, I swung her, flipped her and caught her by her arms and started swinging her, and I let her down."  (Supp. Rule 5 Materials, Tr. of May 21, 1999 Interview of Pet'r (Supp. Tr.), 4,

- 20 -

docket #29.) Petitioner, however, was not sure if her head snapped back and forth. (Supp. Tr., 4-5.) The interview then moved to the second incident in April. That morning, Petitioner and Tammarah argued because Petitioner was going out. (Supp. Tr., 6.) When Petitioner left, he drank. After Petitioner came back to the apartment, he took Abryanna to the store and bought her some candy. (Supp. Tr., 7.) Petitioner left again, smoked marijuana and drank. (Supp. Tr., 8.) When he returned in the afternoon, Tammarah mentioned that she needed to take Abryanna to her mother's house. (Supp. Tr., 9.) Petitioner said that he would be home around 8:00 p.m. (Supp. Tr., 9.) Petitioner drank some more. (Supp. Tr., 10.) At 8:00 p.m., he returned home. (Supp. Tr., 11.) Abryanna was sitting on the potty with a bowl of food. (Supp. Tr., 11, 14.) Tammarah asked Petitioner to see if Abryanna was warm. Petitioner thought she was kind of warm. (Supp. Tr., 11.) Petitioner then pulled up Abryanna's pull-ups and her pants. (Supp. Tr., 14.) Tammarah gave Abryanna's coat to Petitioner. While he was putting on her coat, Abryanna backed up. (Supp. Tr., 11.) Petitioner pulled Abryanna towards him twice. (Supp. Tr., 11, 15.) "Her head jacked back twice." (Supp. Tr., 11.) Petitioner then zipped up her coat and Abryanna put her head down. (Supp. Tr., 11.) Her head leaned to the left. (Supp. Tr., 11-12.) Petitioner did not remember striking Abryanna. (Supp. Tr., 12.) Tammarah and Abryanna then left to go down the stairs. Tammarah soon yelled that the baby was laying on the steps. (Supp. Tr., 13.) Petitioner brought Abryanna up the stairs and patted her on the back until the police arrived. (Supp. Tr., 14.)

In the interview, Petitioner stated that he must of pulled her too hard because "it had to be if that's what caus[ed] the death." (Supp. Tr., 16.) Petitioner also admitted having a problem with his temper. (Supp. Tr., 16.) In summary, Petitioner stated:

> Cause, I did not hit the baby that day. I did not violently shake her. I
> grabbed her with that coat and yes her head did snap back, I'm not going to lie to

you.  And when they left, for they left the baby head went down in the front. [] I zipped her [] coat [up] and Tammarah took her hand.

(Supp. Tr., 16.)

On cross-examination, Detective Shaffer stated that Tammarah thought Petitioner was shaking Abryanna because Abryanna was choking.  Tammarah did not think Petitioner was trying to hurt Abryanna.  (Tr. IV, 612.)  Tammarah stated that Petitioner hit Abryanna on the left side of the head after she had choked on the ravioli.  (Tr. IV, 613-14.)  Tammarah indicated that Petitioner hit Abryanna hard enough to leave a mark.  (Tr. IV, 614.)  Tammarah thought Petitioner hit Abryanna three or four times.  (Tr. IV, 614-15.)  Tammarah also stated that there were about fifteen or sixteen bruises on Abryanna's head.  (Tr. IV, 615-16.)  Tammarah admitted that Petitioner hit Abryanna on the head a lot.  (Tr. IV, 615.)

At the conclusion of the trial, on November 3, 1999, the jury found Petitioner guilty of second-degree murder.  (Tr. IV, 712.)  On December 20, 1999, Petitioner was sentenced to life imprisonment as a habitual offender.  (Sentencing Transcript, (S. Tr.). 3, 16, docket #18.)  After the Michigan Court of Appeals remanded Petitioner's case for resentencing, the trial court resentenced Petitioner to a term of life imprisonment as a habitual offender on September 17, 2003. (Resentencing Tr. 29-30, docket #20.)

**B.    Direct Appeal**

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief raised the following claims of error:

I.    THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE VERDICT OF SECOND[-]DEGREE MURDER AND [PETITIONER'S] CONVICTION REPRESENTS A DENIAL OF DUE PROCESS OF LAW.  US CONST AM XIV; MICH CONST ART I, §17.

II.    THE COURT'S FAILURE TO CORRECTLY INSTRUCT THE JURY ON THE ISSUE OF INTENT AND KNOWLEDGE IN RESPONSE TO ITS QUESTION ALLOWED [PETITIONER'S] CONVICTION OF SECOND DEGREE MURDER ON PROOF LESSER THAN THAT REQUIRED; [PETITIONER] WAS DENIED HIS RIGHT TO A PROPERLY INSTRUCTED JURY, HIS RIGHT TO ACCURATE AND ADEQUATE INSTRUCTIONS ON EACH ELEMENT OF THE OFFENSE, AND HIS RIGHT TO A FAIR TRIAL.  US CONST AM XIV; MICH CONST ART I, §17.

III.   [PETITIONER] WAS DENIED A FAIR TRIAL BY THE ERRONEOUS ADMISSION OF EVIDENCE OF "SIMILAR ACTS" WHICH WERE NOT RELEVANT AND WHICH WERE MORE UNFAIRLY PREJUDICIAL THAN PROBATIVE.  US CONST AM XIV; MICH CONST ART I, §17.

IV.    THE PROSECUTOR COMMITTED REVERSIBLE ERROR AND DENIED [PETITIONER] A FAIR TRIAL BY REPEAT[EDLY] APPEALING TO THE SYMPATHY OF THE JURY.

V.     [PETITIONER] WAS DENIED HIS RIGHT TO A PROPERLY INSTRUCTED JURY AND TO A FAIR TRIAL BY THE FAILURE TO GIVE THE APPROPRIATE CAUTIONARY INSTRUCTION REGARDING TAMMARAH LEONARD'S CREDIBILITY[.] US CONST AM XIV; MICH CONST ART 1 SEC 17.

VI.    [PETITIONER] MUST BE RESENTENCED WHERE THE GUIDELINES ARE MISSCORED AND HE WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING[.] US CONST AM VI; MICH CONST ART 1 SEC 17.

       A.    OFFENSE VARIABLE 3 WAS INACCURATELY SCORED.

       B.    [PETITIONER] WAS SENTENCED BASED ON AN INACCURATE GUIDELINES GRID.

VII.   THE LIFE SENTENCE IN THIS CASE IS AN ABUSE OF DISCRETION AND VIOLATES THE PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT.  US CONST AM VIII; MICH CONST ART 1 SEC 17.

       A.    THE LIFE SENTENCE IS CRUEL AND UNUSUAL PUNISHMENT.

(Def-Appellant's Br. on Appeal, docket #21.)  By unpublished opinion issued on November 15, 2002, the Michigan Court of Appeals rejected all of the appellate arguments except for the sixth claim.  The appellate court found that Petitioner's counsel was ineffective for failing to object to the scoring of offense variable 3.  The Michigan Court of Appeals then affirmed Petitioner's conviction but remanded for resentencing.  (*See* Nov. 15, 2002 Mich. Ct. of Appeals Op. (Nov. 15, 2002 MCOA Op.), docket #21.)

Petitioner filed a delayed application for leave to appeal to the Michigan Supreme Court.  Petitioner only raised the first five claims from his direct appeal.  By order entered May 30, 2003, the Michigan Supreme Court denied Petitioner's delayed application for leave to appeal because it was not persuaded that the questions presented should be reviewed by the court.  (*See* May 30, 2003 Mich. Order, docket #22.)

Pursuant to the November 15, 2002 opinion of the Michigan Court of Appeals, the trial court resentenced Petitioner on September 17, 2003 to a term of life imprisonment as a habitual offender.  (Resentencing Tr. 29-30, docket #20.)  Petitioner appealed to the Michigan Court of Appeals.  His brief raised the following issue on appeal: "[i]s the life sentence in this case an abuse of discretion, a violation of the prohibition against cruel and unusual punishment, and does it ignore the potential for rehabilitation by [Petitioner]."  (Def-Appellant's Br. on Appeal, docket #23.)  On March 2, 2006, the Michigan Court of Appeals rejected Petitioner's appellate argument and affirmed Petitioner's sentence.  (*See* Mar. 2, 2006 Mich. Ct. of Appeals Opinion, docket #23.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same claim in his March 2, 2006 appeal.  By order entered August 29, 2006, the Michigan Supreme Court denied Petitioner's application for leave to appeal because it was

not persuaded that the questions presented should be reviewed. (*See* Aug. 29, 2006 Mich. Order, docket #24.)

## **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

**Discussion**

**I.      Sufficiency of the Evidence**

In his first ground for habeas corpus relief, Petitioner asserts that he is entitled to habeas relief because the prosecution presented insufficient evidence to support his conviction for second-degree murder.  Specifically, Petitioner argues that the evidence was insufficient to support the element of malice because Petitioner could not have known that shaking a two-year old child would cause great bodily harm or death.  (Attach. 1 to Pet., Def.-Appellant's Br. on Appeal, 9, 14-15, docket #1.)  Petitioner also argues that he was not subjectively aware of the magnitude of the risk to the victim.  (*Id.* at 12-15.)

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Id.*  Issues of credibility may not be reviewed by the habeas court under this standard.  *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993).  Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law.  *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-197 (6th Cir. 1988).

Under Michigan law, second-degree murder requires proof of "malice," which is defined as "the intent to kill, the intent to cause great bodily harm, or the intent to do an act in

wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *People v. Aldrich,* 631 N.W.2d 67, 80 (Mich. Ct. App. 2001). Malice may be inferred from evidence that the defendant "intentionally set in motion a force likely to cause death or great bodily harm." *Id.* (citation omitted.)

       The Michigan Court of Appeals thoroughly addressed the question as follows:

> Defendant argues that the evidence was insufficient to support his conviction for second-degree murder. Specifically, he contends that while the evidence portrayed him as a harsh disciplinarian, it did not establish his intent to kill or to inflict great bodily harm. Defendant argues that he did not know that shaking the victim would cause great bodily harm or death and[,] thus, at most, his actions were grossly negligent. He further claims that, because he did not have a subjective awareness of the magnitude of risk, i.e., knowledge that grievous harm was very likely to result, he could not be convicted.

> In reviewing the sufficiency of the evidence, we "must view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proved beyond a reasonable doubt." *People v Hoffman*, 225 Mich App 103, 111, 570 NW2d 146 (1997), citing *People v Wolfe*, 440 Mich 508, 515, 489 NW2d 748 (1992), amended 441 Mich 1201, 489 NW2d 748 (1992). All conflicts with regard to the evidence must be resolved in favor of the prosecution. *People v Terry*, 224 Mich App 447, 452, 569 NW2d 641 (1997).

> Second-degree murder is a general intent crime. *People v Herndon*, 246 Mich App 371, 386, 633 NW2d 376 (2001). There are four elements of the crime: (1) a death, (2) caused by an act of defendant, (3) with malice, and (4) without justification or excuse. *People v Kris Aldrich*, 246 Mich App 101, 123, 631 NW2d 67 (2001). Defendant contests the sufficiency of the evidence only on the element of malice. That element requires proof that defendant had an intent to kill, an intent to cause great bodily harm, or an intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm. *Id.* Malice may be inferred from evidence that defendant "intentionally set in motion a force likely to cause death or great bodily harm." *Id.*, citation omitted. The offense " 'does not require an actual intent to harm or kill, but only the intent to do an act that is in obvious disregard of the life-endangering consequences.['] " [] *Id.*, citation omitted. In other words, "[b]ecause depraved-heart murder is a general intent crime, the accused need not actually intend the harmful result." *People v Goecke*, 457 Mich 442, 466, 579 NW2d 868 (1998). Only in an unusual case should there be a determination of whether the defendant

was subjectively aware of the risk created by his conduct. *Id.* at 464-465, 579 NW2d 868.

> [M]ost depraved-heart murder cases do not require a determination of the issue of whether the defendant actually was aware of the risk entailed by his conduct; his conduct was very risky and he himself was reasonable enough to know it to be so. It is only the unusual case which raises the issue-where the defendant is more absent-minded, stupid or intoxicated than the reasonable man. [ *Id.* at 465, n 25, 579 NW2d 868 (alteration in original).]

The evidence in this case, viewed in a light most favorable to the prosecution, was sufficient to enable the jury to find that defendant intentionally set in motion a force likely to cause great bodily harm. Defendant became angry at the victim, apparently for playing with her food. He forcefully shook the victim, who weighed approximately twenty-five pounds. Medical evidence established that the victim was shaken with violent and tremendous force, resulting in retinal hemorrhaging and injury to the brain. The blows to the victim's head were also tremendous and numerous. The victim had numerous, very fresh bruises on her head when she arrived at the hospital. Further, Stephen Cohle, who performed the autopsy, opined that death was caused by a combination of both the shaking injuries and the blunt force injuries. This evidence was sufficient to support an inference that defendant had the requisite intent to inflict great bodily harm. This is not an unusual case, which necessitates a determination of whether defendant was subjectively aware of the risk his conduct posed.

(Nov. 15, 2002 MCOA Op. at 2-3.)

The Michigan Court of Appeals properly applied the *Jackson* standard. As a consequence, the appellate court's decision is entitled to deference unless that decision was contrary to or an unreasonable application of *Jackson*.

The decision of the Michigan Court of Appeals was supported by the trial record. The prosecutor presented strong evidence to satisfy the malice requirement for second-degree murder because the evidence indicated that Petitioner intended to inflict great bodily harm or set forth a motion to cause great bodily harm.

Tammarah Leonard testified that she witnessed Petitioner hold Abryanna by her arms, ask her why she was playing with her food, and shake her. (Tr. II, 405.) "He had started shaking her like that, real hard. And I dropped her diaper bag and before I got over he had hit her across her head a couple times and then I [] grabbed her from him." (Tr. II, 405.) Tammarah testified that Petitioner hit Abryanna three or four times, "real hard." (Tr. II, 405.) When he was interviewed by police on May 21, 2009, Petitioner admitted that he pulled Abryanna towards him twice while putting on her coat, with such force that "[h]er head jacked back twice." (Supp. Tr., 11-12, 15.) Abryanna died two days later. (Tr. II, 278.)

After performing Abryanna's autopsy, Doctor Stephen Cohle concluded that Abryanna died from head injuries, which could have been caused by either the shaking or blunt force trauma to her head, or both. (Tr. III, 505.) In Abryanna's autopsy, Doctor Stephen Cohle found ten separate bruises beneath Abryanna's scalp, which occurred within hours of Abryanna going to the hospital. (Tr. III, 498, 510.) Even if Petitioner did not think that shaking Abryanna alone could cause great bodily harm or death, a rational trier of fact could find that shaking and repeatedly striking Abryanna's head would likely cause great bodily harm or set forth a motion to cause great bodily harm to satisfy malice. Therefore, Petitioner's due process claim fails.

Petitioner also argues that he was not subjectively aware of the magnitude of the risk to the victim. Second-degree murder is a general intent crime. *See People v. Goecke,* 579 N.W.2d 868, 879 (Mich. 1998.) It is only the unusual case that raises the issue of whether a defendant was subjectively aware of the risk created by his conduct, such as "where the defendant is more absent-minded, stupid or intoxicated than the reasonable man." *Id*. at 879 n.25. Petitioner has not presented any argument that his case falls within the unusual circumstance to require a determination

that he was actually aware of the risk created by his conduct. Voluntary intoxication is not an available defense to second-degree murder, *see Goecke,* 579 N.W.2d at 879, and the trial court so instructed the jury. (Tr. IV, 696.)

Accordingly, I conclude that Petitioner is not entitled to relief because the Michigan Court of Appeals' decision was neither contrary to nor an unreasonable application of *Jackson.* 28 U.S.C. § 2254(d); *Williams,* 529 U.S. at 412; *Bailey,* 271 F.3d at 655.

## II. Jury Instructions

In his second ground for habeas corpus relief, Petitioner claims that the trial court failed to correctly instruct the jury on the element of malice for second-degree murder in response to a question by the jury.[2] Typically, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review. Instead, Petitioner must show that the erroneous instruction "so infected the entire trial that the resulting conviction violates due process, " not merely "whether the instruction is undesirable, erroneous, or even universally condemned." *Henderson v. Kibbe*, 431 U.S. 145, 154-55 (1977) (quotation omitted); *see also Estelle v. McGuire*, 502 U.S. 62, 75 (1991) (erroneous jury instructions may not serve as the basis for habeas relief unless they have "so infused the trial with unfairness as to deny due process of law"); *Sanders v. Freeman*, 221 F.3d 846, 860

_____

[2]Respondent argues that this claim is procedurally defaulted. (Resp't's Answer; docket #10.) This Court may decide the claim on the merits. The U.S. Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)). *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001), *rev'd on other grounds*, *Bell v. Cone*, 535 U.S. 685 (2002); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

(6th Cir. 2000) (same).  If Petitioner fails to meet this burden, he fails to show that the jury instructions were contrary to federal law.  *Id.*

During jury instructions, the trial court instructed the jury as to the elements of second-degree murder in accordance with section 16.5 of the Michigan Standard Criminal Jury Instructions (CJI2d 16.5).  (Tr. IV, 693-94.)  Petitioner did not object.  During deliberations, the jury sent the following question to the judge:

> We've received a question from the jury.  And what they have done is, you're both aware, is to send back someone's copy of CJI 2nd 16.5, which is the jury instruction of the elements of Second[-]Degree Murder.  And they've underlined a sentence in the third element.  They've underlined the following words:
>
> Or he intended to do great bodily harm to Abryanna Grant.
>
> They'[ve] drawn -- someone's drawn an arrow down to that and it says:
>
> Does this part of the sentence stand alone?  Does this include that he knowing [sic] that death or such harm would be the likely result of his actions?

(Tr. IV, 702-03) (quotation marks omitted.)  Outside the presence of the jury, defense counsel argued that malice requires 'knowledge,' regardless of whether Petitioner intended to kill, intended to do great bodily harm to Abryanna Grant, or created a very high risk of death or great bodily harm knowing that death or such harm would be the likely result of his actions.  (Tr. IV, 705.)  Rejecting Petitioner's argument, the trial court instructed the jury that Petitioner required one of the following three states of mind: "[h]e intended to kill, or he intended to do great bodily harm to Abryanna Grant, or he knowingly created a very high risk of death or great bodily harm knowing that death or such harm would be the likely result of his actions."  (Tr. IV, 707-08.)

The Michigan Court of Appeals rejected Petitioner's claim, in pertinent part, as follows:

On appeal, defendant complains that the trial court erred when it failed to clarify for the jury that he had to be subjectively aware that his conduct could cause grievous harm. He contends that the mere fact that he intentionally shook the child is meaningless if he did not have knowledge that death or great bodily harm was almost certain to result. Defendant's position has no merit. There are three possible intents that may suffice to establish the crime of second-degree murder. *People v Dykhouse*, 418 Mich 488, 495, 345 NW2d 150 (1984). The intent to inflict great bodily harm is distinct from the intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result. *See People v Nowack*, 462 Mich 392, 408, 614 NW2d 78 (2000), citing *People v Aaron*, 409 Mich 672, 714, 299 NW2d 304 (1980). There is no requirement that, in order to find intent to inflict great bodily harm, the jury must determine that the defendant was subjectively aware or knew that his actions would likely result in death or great bodily harm. Indeed, as previously discussed, defendant did not actually have to intend the harmful result if he set in motion a force likely to cause such harm. *Goecke*, *supra*; *Aldrich*, *supra*. The standard jury instruction, CJI2d 16.5, was correct and adequate. It fairly presented the issue of intent and sufficiently protected defendant's rights. *Daniel*, *supra*. There was no error.

(Nov. 15, 2002 MCOA Op. at 4.)

The Michigan Court of Appeals' decision is neither contrary to Supreme Court precedent nor an unreasonable application thereof. The trial court instructed the jury on the element of malice under state law. (*See* Tr. IV, 693-94.) Federal courts do not reinterpret state law. "Generally speaking, federal habeas corpus is not the proper vehicle for state prisoners to seek review of issues of state law. State courts, after all are the final arbiters of the state law's meaning and application . . . ." *White v. Steele*, --- F.3d ---, ---, No. 08-5498, 2009 WL 4893144, at *3 (6th Cir. Dec. 21, 2009) (citing *Thompson v. Bock,* 215 F. App'x 431, 436 (6th Cir. 2007)) (internal quotations and citations omitted); *see also Douglas v. City of Jeannette,* 319 U.S.157, 163 (1943). Further, Petitioner has not identified any Supreme Court authority that requires the trial court to incorporate a knowledge requirement into the first two alternatives of the element of malice: intent to kill or intent to do great bodily harm. As stated in Section I, there was ample evidence to find that Petitioner satisfied the element of malice for second-degree murder. Petitioner therefore has not

shown that the trial court's instruction on malice "so infected the entire trial that the resulting conviction violates due process." *See Henderson*, 431 U.S. at 156-57. Accordingly, Petitioner's habeas claim fails.

### III.    Similar Acts Evidence

In his third ground for habeas corpus relief, Petitioner argues that he was denied a fair trial due to the admission of 'similar acts' evidence under Michigan Rules of Evidence 404(b).[3] Petitioner disputes the introduction of the following similar acts: (1) that Petitioner shook the victim on March 4, 1999; (2) that a neighbor saw Petitioner kick and push the victim approximately two weeks before her death; and (3) that Petitioner physically abused Tammarah Leonard. (Attach. 1 to Pet., Def.-Appellant's Br. on Appeal, 22, docket #1.)

The Michigan Court of Appeals rejected Petitioner's claims, in pertinent part, as follows:

> In this case, the trial court admitted evidence of three other bad acts: (1) that defendant shook the victim on March 4, 1999; (2) that a neighbor saw defendant kick and push the victim approximately two weeks before her death; and (3) that defendant physically abused [Tammarah] Leonard. Defendant concedes that the admission of evidence that he physically abused Leonard was justified to explain why Leonard waited so long to implicate defendant. Given defendant's concession and his lack of argument with respect to the admissibility of that evidence, he has abandoned any argument that its admission was an abuse of discretion. With respect to the other two acts, we find no abuse of discretion. The evidence was not offered to show that defendant was a bad man or had a bad character. The prosecution identified several proper purposes for the admission of the evidence, including that it was relevant to defendant's intent, absence of mistake, knowledge, pattern of extreme discipline, and possible motive.

---

[3]Michigan Rules of Evidence 404(b)(1) provides that evidence of other crimes, wrongs or acts is not admissible to prove the character of a person to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

The evidence was also logically relevant. Defendant's defense was to argue that he did not know that his actions could cause death or grave bodily harm. Defendant also suggested that Leonard may have inflicted the injuries. The evidence of the prior shaking and the prior physical pushing and kicking was logically relevant and highly probative to support the element of intent and to rebut the asserted defenses. Other instances when a defendant deliberately injures a particular child are probative of malice. *People v Biggs*, 202 Mich App 450, 452, 509 NW2d 803 (1993). Specifically, they are probative of defendant's intent to kill or cause great bodily harm, or of defendant's willful and wanton disregard for the natural consequences of the actions. *Id.* In addition, the other instances of defendant's abuse against the particular child "are also probative of the absence of mistake or accident." *Id.* at 452-453, 509 NW2d 803. Further, evidence that defendant previously shook the victim and that he previously kicked the victim and hit or pushed her on the back of her head demonstrated that defendant had a common plan or scheme of physically abusing the victim. *People v Sabin* (After Remand), 463 Mich 43, 65-66, 614 NW2d 888 (2000). We also note that the testimony was relevant to explain the medical findings, which showed that the victim had evidence of older bleeding on the brain at the time of her death.

While the other-acts evidence was prejudicial, as is the case with all bad-acts evidence, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. MRE 403. Moreover, it was essential to include the prior, known acts of violence against the child to give the jury an intelligible presentation of the full context in which the disputed event took place. *People v Sholl*, 453 Mich 730, 740-741, 556 NW2d 851 (1996). Further, the trial court gave a limiting instruction with respect to the testimony at issue. Therefore, we find no abuse of discretion in the admission of the evidence.

(Nov. 15, 2002 MCOA Op. at 5-6.)

To the extent Petitioner raises a claim under Michigan Rules of Evidence 404(b), his claim is not cognizable on habeas review. The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle*, 502 U.S. 62, an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-

68.  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id.* at 68.

State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  This approach accords the state courts wide latitude in ruling on evidentiary matters.  *Seymour*, 224 F.3d at 552 (6th Cir. 2000).  Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently.  The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts.  *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).

Petitioner has not met this difficult standard.  The admission of similar bad acts testimony pursuant to Michigan Rules of Evidence 404 violated no traditional and fundamental principle of justice.  The United States Supreme Court has declined to hold that the admission of similar "other acts" evidence is so extremely unfair that its admission violates fundamental concepts of justice.  *See Dowling v. United States*, 493 U.S. 342, 352-53 (1990).  Although the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms.  Thus, "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts

evidence." *Bugh*, 329 F.3d at 512; *see also Estelle*, 502 U.S. at 70 (holding that admission of prior injury evidence that infant victim suffered from battered child syndrome was relevant to establish intent in second-degree murder prosecution, and, thus, did not violate due process).

Further, the trial court specifically gave the jury a limiting instruction regarding bad acts testimony:

> You have heard evidence that was introduced to show that the defendant committed improper acts for which he is not on trial. And specifically I'm referring here to the testimony of Erica Thompson and also Erica Robinson. If you believe this evidence you must be very careful only to consider it for certain purposes. You may only think about whether this evidence tends to show that the defendant specifically meant to kill Abryanna Grant, to do great bodily harm to Abryanna Grant, or to create a very high risk of death or great bodily harm knowing that death or such harm would be the likely result of his actions; or that the defendant acted purposely -- purposefully, that is, not by accident or mistake or because he misjudged the situation; or that the defendant used a plan, system, or characteristic scheme that he has used before or since; or who committed the crime that the defendant is charged with.

> You must not consider this evidence for any other purpose. For example, you must not decide that it shows that the defendant is a bad person or that he is likely to commit crimes. You must not convict the defendant here because you think he is guilty of other bad conduct. All the evidence must convince you beyond a reasonable doubt that the defendant committed the alleged crime or you must find him not guilty.

(Tr. IV, 692-93.) There is no reason to believe that the jury was unable to follow the trial court's instruction. Because the admission of similar bad acts is not constitutionally barred, and because the trial court reasonably limited the evidence and provided an appropriate instruction, admission of the evidence was not fundamentally unfair. Accordingly, the state-court's decision to admit the similar acts testimony was neither contrary to nor an unreasonable application of Supreme Court precedent.

## IV.     Prosecutorial Misconduct

In his fourth ground for habeas corpus relief, Petitioner argues that the prosecutor violated his due process rights by appealing to the sympathy of the jury in his opening statement and closing arguments.    (Attach. 1 to Pet., Def.-Appellant's Br. on Appeal, 30-31, docket #1.) Respondent contends that Petitioner's claims of prosecutorial misconduct are procedurally defaulted. (Resp't's Answer at 5-6, docket #10.)

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim.  *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice.  *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner

asserts a claim of actual innocence based upon new reliable evidence.  *House*, 547 U.S. at 536.  A

habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence,

it is more likely than not that no reasonable juror would have found petitioner guilty beyond a

reasonable doubt.  *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

### A.    Opening Statement

Petitioner complains of the following opening statement by the prosecutor regarding

the murder of a child:

> The murder of a child is different.  From the moment that case lands on your
> desk and you start reading through the police reports about the last days and hours
> of a little kid's life, you can't stop thinking about it.  From the moment you start
> flipping through photographs of that little kid lying in that hospital bed with tubes
> down her throat and bruises all over her head and body, you can't get it out of your
> mind.

> You're going to see those photographs as part of this evidence.

> From the moment you watch the videotape that the troopers took of the
> apartment that she and her mother and her mother's 32-year-old boyfriend lived in,
> and they videotaped that little kid's room, the stillness and the silence, the little pink
> bunnies and the teddy bears and the little pink slippers that are lying in the corner,
> you can't get it out of your mind.

> Murder of a child is different because it crawls up inside of you -- until this
> day, which I probably can stand in front of you and talk for her, who can't be heard
> anymore.

(Tr. I, 133-34.)  Petitioner did not object to the prosecutor's opening statement.  Because Petitioner

did not raise the issue at trial, the Michigan Court of Appeals reviewed the issue only for plain error,

stating:

> Defendant next argues that the prosecutor improperly appealed to the
> sympathy of the jury. Defendant specifically challenges one passage from the
> prosecutor's opening statement.  Defendant failed to object to the comments.  To
> avoid forfeiture of this unpreserved claim of prosecutorial misconduct, defendant
> must establish a plain error, which was outcome determinative.  *People v Watson*,

245 Mich App 572, 586, 629 NW2d 411 (2001).  There is no error if the prejudicial effect of an improper comment could have been cured by a timely instruction.  *Id.*  In this case, the prosecutor's opening statement included a passage, which was emotional and appealed to the juror's sympathy.  Appeals to the sympathy of the jury constitute improper argument.  *Id.* at 591, 629 NW2d 411.  However, the challenged comments were isolated and did not prevail throughout trial. They were confined to the beginning of the opening statement.  Moreover, a timely curative instruction would have cured any prejudice.  Further, the trial court later instructed the jury that it must not let sympathy or prejudice influence its decision.  The trial court also instructed that the lawyers' statements and arguments were not evidence.  There was no plain error requiring reversal.

(Nov. 15, 2002 MCOA Op. at 6.)

The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claim.  It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial.  *See, e.g.*, *People v. Kelly*, 423 Mich. 261, 271 (1985).  A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy."  *Lee v. Kemna*, 534 U.S. 362, 385 (2002).  Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court.  *See Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977); *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996).  The court of appeals' subsequent review of the issue did not waive the procedural default.  In this circuit, "plain error review does not constitute a waiver of state procedural default rules."  *Seymour v. Walker*, 224 F.3d 542 (6th Cir. 2000) (citations omitted); *Scott v. Mitchell*, 209 F.3d 854, 866-68 (6th Cir. 2000); *see also Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998) (state court's alternative holding on the merits does not require federal court to disregard the procedural bar); *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991) (same); *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989) (claim is defaulted even where the state court may excuse the

default for "manifest injustice"); *Federico v. Yukins*, No. 93-2424, 1994 WL 601408, at \*3-\*4 (6th Cir. Nov. 2, 1994) (same, for "miscarriage of justice"). Accordingly, review by this court is barred unless Petitioner can show cause and prejudice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray*, 477 U.S. at 485.

To show cause sufficient to excuse a failure to raise claims on direct appeal, Petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal. *Murray*, 477 U.S. at 488; *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991). Petitioner has not even attempted to explain why he could not have raised this issue before the trial court. Where a petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985). Moreover, Petitioner has not demonstrated that manifest injustice would result because he has not made a colorable claim of innocence; he has not shown that any constitutional error "probably" resulted in the conviction of one who was actually innocent. *Schlup*, 513 U.S. at 322 (citing *Murray*, 477 U.S. at 495). Accordingly, I conclude that Petitioner's claim is procedurally defaulted and may not be reviewed by the Court.

**B.  Closing Arguments**

During the prosecutor's closing arguments, Petitioner alleges that the prosecutor improperly expressed his personal opinion concerning the meaning of the following letter that Petitioner wrote to Tammarah Leonard:

> I said you felt this is something you have to do and he said, well, you're the one prosecuting me. I said I thought you loved me, but I guess I was wrong. Because I remember you saying after you get your time you'll be out so we can be together, but I heard you've been sentenced and plan on nailing me to the cross. My family is praying for us both so keep praying. Once this is over, we'll be together.

We'll be out together. And once your probation is over, we'll leave this town for good.

What's he promising her? Don't testify against me because they won't get me if they don't have your words –

MR. RENFRO [Defense Counsel]: Your Honor, I'm going to object. The prosecutor keeps injecting his own personal opinion about this.

\* \* \*

. . . P.S. Don't help to keep us apart. Love will keep us together. The prosecutor will take us apart forever. And I'm ready to see, touch, smile, taste, and [do] all the things we're used to doing.

He's promising her physical affection if she'll just not testify against him so that he can get off, get out, be together with her and they can run off to another town.

(Attach. 1 to Pet., Def.-Appellant's Br. on Appeal, 30, docket #1) (quoting Tr. IV, 653, 655)

(quotations omitted.) The letter was admitted into evidence during the trial. (Tr. IV, 420-26.)

While Petitioner objected to the argument by the prosecutor, the trial court overruled Petitioner's

objection. (Tr. IV, 654.)

The Michigan Court of Appeals found the claim procedurally defaulted but decided

the issue on the merits, as follows:

We are aware that defendant also argues that the prosecutor improperly injected his personal opinion during closing argument. This argument is not properly presented to this Court because defendant failed to raise this challenge in his statement of questions presented. *People v Miller*, 238 Mich App 168, 172, 604 NW2d 781 (1999). Regardless, the prosecutor's comment constituted a reasonable inference gleaned from the evidence. *People v Fisher*, 220 Mich App 133, 156, 559 NW2d 318 (1996).

(Nov. 15, 2002 MCOA Op. at 6.)

Although the Michigan Court of Appeals found the issue procedurally defaulted, this Court will address the issue on the merits. *See Hudson*, 351 F.3d at 216 (where a claim lacks merit, the courts may decline to address the preliminary question of procedural default.)

In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court. *See id.* at 12-13 (1985); *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935). "This court has been reluctant to grant habeas petitions based on improper prosecutorial statements at closing argument." *Wilson v. Mitchell*, 250 F.3d 388, 398 (6th Cir. May 14, 2001).

The prosecutor's comments regarding the intent of Petitioner's letter did not so infect the trial as to constitute a denial of due process. From the letter, the prosecutor inferred that Petitioner was asking Tammarah Leonard not to testify against him in return for physical affection.

In his brief, however, Petitioner did not quote the prosecutor's entire treatment of the letter.[4]  Prior to the quote provided by Petitioner, the prosecutor cited the following passage from the letter: "[m]y lawyer says you're the only one who can help or hurt me.  No one else but you.  Because without your words they have nothing." (Tr. IV, 652.)  The letter later states: "[d]on't help to keep us apart.  Love will keep us together.  The prosecutor will take us apart forever.  And I'm ready to see, touch, smile, taste, and [do] all the things we're used to doing."  (Tr, IV, 655.)  Because the prosecutor made a reasonable inference that Petitioner was promising physical affection for Tammarah not to testify against him, the prosecutor's closing remarks were not improper.  *See Givens v. Yukins*, No. 98-2429, 2000 WL 1828484, at *7 (6th Cir. Dec. 5, 2000) (referring to the petitioner as a liar, thief, drug kingpin, and prostitute in closing argument did not constitute prosecutorial misconduct when the prosecutor's comments were supported by evidence admitted at trial).

Moreover, even if the remarks were unfairly prejudicial in some way, they fall far short of the sort of unfairness protected by the Due Process Clause.  The prosecutor's argument was neither extensive nor misleading.  *See Young*, 470 U.S. at 11-12.  The evidence against Petitioner was strong.  *See id.* at 12-13 (1985); *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger*, 295 U.S. at 84-85.  The trial court instructed the jury that the prosecutor's remarks were not evidence at the time of Petitioner's objection and during jury instructions.  (Tr. IV, 654, 686); *see also Byrd*, 209 F.3d at 538.  Federal courts generally "presume that juries follow their instructions." *Washington v. Hofbauer*, 228 F.3d 689, 706 (6th Cir. 2000).  For all these reasons, the appellate court properly concluded that Petitioner's claims of prosecutorial misconduct did not rise to the level

---

[4]A court may not consider words in a vacuum.  It is critical that a court examine the prosecutor's remarks in their context.  *Hall v. Vasbinder*, 563 F.3d 222, 234 (6th Cir. 2009) (citing *United States v. Robinson,* 485 U.S. 25, 33 (1988)).

of a due process violation.  Accordingly, the Michigan Court of Appeals' decision is neither contrary

to Supreme Court precedent nor an unreasonable application thereof.

**Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition

be denied.

Dated:  March 1, 2010                          /s/ Hugh W. Brenneman, Jr.
                                                HUGH W. BRENNEMAN, JR.
                                                United States Magistrate Judge

**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within 14 days of
service of this notice on you.  28 U.S.C. § 636(b)(1)(c); FED. R. CIV. P. 72(b).  All objections and
responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely
objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d
947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).